# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 29, 2012

Lyle W. Cayce
Clerk

No. 10-61006
consolidated with
No. 11-60122

ILLINOIS CENTRAL RAILROAD COMPANY,

Plaintiff - Appellee

v.

WILLIAM GUY; THOMAS W. BROCK,

Defendants - Appellants

Appeals from the United States District Court
for the Southern District of Mississippi

Before REAVLEY, ELROD, and HAYNES, Circuit Judges.

REAVLEY, Circuit Judge:

A jury returned a verdict in favor of Plaintiff-Appellee Illinois Central Railroad on its claims of fraud and breach of the duty of good faith and fair dealing against Appellant-Defendants William Guy and Thomas W. Brock. Guy and Brock's misrepresentations induced Illinois Central to settle the asbestos exposure claims of two former Illinois Central employees whom Guy and Brock represented in a state-court lawsuit. On appeal, Guy and Brock contend that the district court lacked subject matter jurisdiction over the instant case under the Rooker-Feldman doctrine, and alternatively that the case called for Burford

abstention under Burford v. Sun Oil Co.[1]  They also contend that the trial evidence established their statute-of-limitations and waiver defenses as a matter of law.

Guy and Brock misconceive the legal authorities relevant to their jurisdiction, abstention, and waiver arguments.  Regarding the statute of limitations issue, we conclude that a reasonable jury could have found for Illinois Central.  We therefore AFFIRM the district court's judgment.

## I. BACKGROUND

Our explanation of the case's background is based on the undisputed facts and the evidence presented at trial.  Our treatment of disputed factual matters is informed by the standard of review applicable to a post-trial challenge to the sufficiency of the evidence, which requires us to view the trial evidence in the light most favorable to the jury's verdict. See Staub v. Proctor Hosp.[2]  Guy and Brock represented Warren R. Turner, Jr., Willie R. Harried, and roughly 170 other plaintiffs alleging asbestos exposure during their employment with Illinois Central in a suit filed on August 1, 2001, in the Circuit Court of Jefferson County, Mississippi, styled Elbert Eakins, et al. v. Illinois Central Railroad Co., No. 2001-65 (Jefferson Cnty. Cir. Ct. Miss.).  The Eakins case proceeded in parallel with Robert Allen v. Illinois Central Railroad Company, No. 2000-100 (Jefferson Cnty. Cir. Ct. Miss.), another multi-plaintiff case in which Guy and Brock represented numerous individuals suing Illinois Central for asbestos exposure.  The cases proceeded before the same judge, and in most respects were treated as though they had been consolidated.

---

[1] 319 U.S. 315, 635 S. Ct. 1098 (1943).

[2] ____ U.S. _____, 131 S. Ct. 1186, 1189 (2011).  A separate treatment of the facts as they relate to Guy and Brock's Rooker-Feldman and abstention arguments is not necessary, as none of the facts material to those issues are in dispute.

Turner was one of a small number of the Eakins plaintiffs selected for early discovery and trial. The Eakins trial court allowed discovery regarding the plaintiffs in this "trial group," and their claims were scheduled for trial on October 15, 2002. That trial did not happen because Guy and Brock and Illinois Central reached an agreement establishing a process for expedited evaluation and settlement of all of the Eakins plaintiffs' claims. The August 6, 2002 agreement preserved Illinois Central's right to refuse settlement if the plaintiff had not actually worked for Illinois Central, had not been diagnosed with an asbestos-related illness, or had not sued within the three-year statute of limitations provided by the Federal Employer Liability Act ("FELA").[3] The agreement provided for limited discovery on those matters regarding the 160-odd Eakins plaintiffs not in the trial group. For them, the agreement called for Guy and Brock to provide each plaintiff's sworn responses to a "pulmonary questionnaire." The questionnaire asked for the plaintiff's employment history, any other known history of asbestos exposure or asbestos-related medical history, and any involvement in prior asbestos litigation. After receiving a plaintiff's completed questionnaire, Illinois Central was required to review the claim and either assert one of the preserved grounds for refusing settlement or make a firm settlement offer. The agreement required that in every three month period Illinois Central would make settlement decisions regarding $6 million worth of claims for which Guy and Brock had submitted completed questionnaires. The agreement required both Guy and Brock and the Eakins plaintiffs themselves to act in good faith in carrying out the settlement process. The settlement procedures agreement used in Eakins was similar to one through

---

[3] 45 U.S.C. §§ 51-60.

which Illinois Central had settled with many of Guy and Brock's clients in the Allen litigation.

Over five years before Eakins was filed, Harried and Turner were plaintiffs in a case brought in Jefferson County against an asbestos manufacturer, David Cosey, et al. v. E.D. Bullard Co. et al., No. 95-0069 (Jefferson Cnty. Cir. Ct. Miss.). Turner's and Harried's counsel in that case was Attorney Robert Pritchard. Turner and Harried were not familiar with the details of Cosey or even the case's formal name. But each recollected that he had been diagnosed with an asbestos-related illness after consulting with Pritchard some time around 1995, and that Pritchard had filed an asbestos claim on his behalf. Both Turner and Harried shared that information with Guy and Brock before the Eakins suit was filed. The diagnoses used in Cosey establish that by 2001 Turner's and Harried's claims against Illinois Central were time barred under FELA's three-year statute of limitations,[4] and Illinois Central would not have settled their claims had it been aware that they were plaintiffs in Cosey. But Guy and Brock withheld that fact from Illinois Central during the settlement process. They omitted the Cosey information from Turner's interrogatory responses concerning his medical and litigation history, which Guy and Brock provided to Illinois Central on January 25, 2002. They also omitted Cosey from Harried's sworn responses to the pulmonary questionnaire, submitted on May 19, 2003. As a result, Illinois Central settled Turner's and Harried's claims. Turner was paid $120,000 on December 23, 2002. Harried was paid $90,000 on November 26, 2003. The Eakins trial court dismissed Turner's and Harried's claims with prejudice.

---

[4] See 45 U.S.C. § 56; Urie v. Thompson, 337 U.S. 163, 170, 69 S. Ct. 1018, 1024–25 (1949).

4

Another Eakins plaintiff who had been in Cosey was Fred Tyler. Tyler was initially in the Eakins trial group, and Guy and Brock provided interrogatory responses on his behalf on January 25, 2002. As with Turner, they omitted Tyler's participation in Cosey. Tyler was dropped from the trial group before the August 6, 2002 settlement procedures agreement, so his claim was subject to the pulmonary questionnaire procedure for non-trial group plaintiffs. Guy and Brock submitted Tyler's sworn responses to the pulmonary questionnaire on July 28, 2003, again omitting Cosey.

At some point in late 2003 or January 2004, Guy and Brock became unsatisfied with the pace at which Illinois Central was processing unsettled claims. They moved the Eakins trial court to enforce Illinois Central's obligation to process $6 million in claims per quarter. But before the Eakins trial court heard that motion, Illinois Central discovered that Tyler had been a plaintiff in Cosey. Illinois Central's lead counsel in Eakins was Attorney Thomas Peters. Illinois Central had not offered Tyler a settlement, but the omission of Cosey from Tyler's interrogatory responses and pulmonary questionnaire caused Peters to lose confidence that Guy and Brock were taking adequate steps to ensure that the information they collected from their clients was accurate. On January 21, 2004, Peters sent Guy and Brock a letter setting forth the omissions from Tyler's interrogatories and pulmonary questionnaire, and asking Guy and Brock to explain. Peters's letter also stated that the omissions had prompted Illinois Central to undertake further investigation of the bulk of the remaining unsettled Eakins claims. Peters did not accuse Guy and Brock of fraud. He believed Tyler was responsible for the misleading omissions, stating in his letter, "The explanation for submissions made by Mr. Tyler point convincingly towards fraud, but we await any explanations Mr. Tyler may have regarding these disconcerting facts."

On February 13, 2004 Illinois Central learned of Turner's and Harried's participation in the Cosey case from a report by an outside investigator. But Illinois Central did not raise the issue with Guy and Brock at that or any other time during the pendency of the Eakins litigation. Subsequent proceedings in Eakins remained focused on the Tyler omissions, and subsequently on discrepancies in affidavits that Guy and Brock later provided to Illinois Central concerning the litigation history of other unsettled Eakins plaintiffs. Illinois Central refused to consider many of the unsettled claims until it had a satisfactory explanation of the Tyler omissions, and it sought dismissal of some of the other unsettled plaintiffs' claims. That dismissal motion and Guy and Brock's motion to compel Illinois Central to more promptly consider unsettled claims were set for a hearing on March 29, 2004. But on the day of the hearing they reached an agreement, memorialized in a handwritten document, that Illinois Central would continue processing unsettled claims if Guy and Brock would provide (1) a letter from Tyler explaining the omissions in his responses; and (2) a letter from Guy and Brock "regarding the procedures they have used to ensure accurate information on pulmonary questionnaires and expert medical info [sic] and what further procedures are anticipated."

Guy and Brock never provided the promised explanation of their procedures, though Peters asked them to do so "many times." On April 22, 2004, Guy and Brock wrote a letter to Illinois Central stating "[i]t should be quite obvious that we have done a good job with the questionnaires in that several hundred have been submitted and there have been very few problems." Regarding Tyler's questionnaire, the letter states "[W]e have spoken to Mr. Tyler. It is apparent that when Mr. Tyler was questioned about prior litigation he understood that he was being asked about a prior case against the railroad." Guy and Brock also promised that "[t]o make sure that this situation does not

6

occur again, we will be supplying affidavits from all remaining unpaid Allen and Eakins plaintiffs regarding all prior asbestos litigation. If a plaintiff has been involved in prior litigation, we will provide you with any document that we can obtain for your review." Peters did not find the explanation of the omissions in Tyler's questionnaire credible, but his suspicion continued to focus of Tyler, not Guy and Brock.

On April 28, 2004, Guy and Brock supplied Illinois Central's counsel with a letter purportedly composed by Tyler. The letter stated that when Tyler first met with Guy and Brock to be tested for asbestosis in relation to a possible claim against Illinois Central, he did not know that the asbestos claim he asserted in Cosey "had anything to do with a claim against the railroad." The letter also stated that when Tyler "was asked about whether [he] had made a prior claim, [he] understood that [he] was being asked if [he] had made a prior asbestos claim against Illinois Central, which [he] had not." Again, Peters did not credit this explanation, and he continued to suspect Tyler.

In fact, Guy and Brock had never asked Tyler whether he was involved in a previous asbestos suit or whether he had been previously diagnosed with an asbestos-related condition. Tyler recognized his signature on the April 28, 2004 letter as his, but he testified that its contents were false and he did not write it. He recalled signing documents when asked to do so by Guy and Brock. Beyond that, he had no part in composing the letter or preparing his responses to the interrogatories and the pulmonary questionnaire.

The Eakins trial court held hearings in June, August, and October 2004, and one in January 2005. Prior to the June hearing, Illinois Central again sought relief with respect to the Tyler omissions. Guy and Brock took the position that the omissions in Tyler's interrogatory and questionnaire responses were mistakes, and on the day of the June hearing they voluntarily moved to

dismiss Tyler's claim. The Eakins court granted their motion. But at the hearing Peters expressed concern that "there's more issues with Mr. Tyler than just dismissal because I think we've got past problems." Peters also said that Illinois Central was "worried about systemic problems" with the pulmonary questionnaires. Peters testified in this case that his comments at the June hearing were about the fact that Guy and Brock had not provided the explanation of their procedures they promised in the March 29, 2004 handwritten agreement. When the Eakins trial court asked Peters whether there was "evidence that this happened with anybody [other than Tyler]," Peters responded "I think there is good evidence that it happened with somebody in the past, your Honor, but we don't know." The Eakins court asked Peters "was this before you settled the case that you knew this or after it or what?" Peters responded, "No, I think we found out about what happened with Mr. Tyler—I think we learned there might be—there might be another individual in the Cosey case." The Eakins trial court asked how long Peters would need "to develop this," and he responded that "it would not be more than a week." In the instant case, Peters testified that he could not recall whom he had in mind when he referred to the possibility of "another individual in the Cosey case." Illinois Central did not subsequently bring evidence to the Eakins court of Harried's and Turner's involvement in Cosey or their misleading submissions.

Nothing in the instant case's trial record indicates that Illinois Central confronted Guy and Brock with the falsehoods in Turner's and Harried's submissions at any time during the pendency of the Eakins case. Nor is there evidence in the trial record that Illinois Central raised the issue with the Eakins trial court, beyond Peters's vague reference to "another individual in the Cosey case" at the June 2004 hearing. When Brock was asked at trial in this case

whether he and Guy made "repeated representations to Illinois Central and the Eakins trial court that y'all didn't have anything improper to do with Mr. Tyler's claim," Brock answered that "we may very well have . . . ." At no point in the Eakins litigation did Peters suspect that Guy and Brock were responsible for the Turner and Harried omissions. He believed that Turner and Harried had been dishonest when supplying information to Guy and Brock.

Charles Garrett, an Illinois Central "risk manager," was responsible for assisting Peters in Eakins. Neither Peters or Garrett suspected that Guy and Brock might be responsible for the omissions until Turner and Harried were deposed in this case on January 10, 2008, and May 15, 2007, respectively. Peters testified that he did not contact Guy and Brock about the Turner and Harried omissions because he did not think they would cooperate: "They weren't even telling me what was going on with Tyler. Why would they give me money back in a case that's over[?]" Also, Peters and Illinois Central's other counsel regarded Jefferson County as a jurisdiction that was "not only dangerous but also unfair." So at some point in the spring or summer of 2004 Illinois Central decided it would file a separate action against Turner and Harried after the Eakins case was complete.

The Eakins trial court denied Illinois Central's request to enforce Guy and Brock's promise to provide a description of their procedures. But the court granted Illinois Central's request to depose Tyler to learn more about what had happened with his interrogatory and questionnaire responses. The deposition was held on August 27, 2004, but Guy and Brock terminated the deposition shortly after it began. After they stopped Illinois Central's counsel's examination of Tyler, Guy said "I feel like we've been in ultimate good faith in everything we've done, and out of hundreds of these things this is the only one . . . problem we've come up with." Throughout the June, August, and October

2004 hearings Guy and Brock made statements to the effect that they had done their best to ensure that their clients provided honest answers to the pulmonary questionnaires.

As they had promised in their April 22, 2004 letter, Guy and Brock supplied affidavits regarding other asbestos litigation from the remaining unsettled Eakins and Allen plaintiffs. Although Guy and Brock had promised affidavits addressing only prior litigation, the affidavits they provided purported to list all other asbestos litigation in which the plaintiff was or had ever been involved. This made several of the affidavits false, because they did not list cases filed after Eakins or Allen. The post-Eakins cases omitted from some of the Eakins plaintiffs' affidavits included cases in which Guy and Brock were the plaintiffs' counsel.

Illinois Central discovered the information omitted from the affidavits and again sought relief from its obligation to continue settling claims under the procedures agreement. The Eakins trial court heard arguments about the affidavits at the October 2004 hearing. The court denied Illinois Central's requested relief and granted a renewed motion from Guy and Brock to enforce the agreement. The trial court refused to rehear Illinois Central's motion after a hearing in January 2005 and entered judgments to enforce the agreements in Eakins and the Allen litigation. Illinois Central filed appeals in both cases, which the Mississippi Supreme Court ultimately disposed of in Illinois Central Railroad v. Acuff, 950 So.2d 947 (Miss. 2006) (disposing of Eakins appeal), and Illinois Central Railroad v. McDaniel, 951 So.2d 523 (Miss. 2006) (disposing of Allen appeal). The Mississippi Supreme Court agreed with the trial court's finding that the omissions from the affidavits were inadvertent and immaterial, and that the trial court did not err in refusing to dismiss the unsettled claims

10

and refusing to relieve Illinois Central from its obligations under the settlement procedures agreements.[5]

Illinois Central sued Harried in the district court on November 22, 2006, and Turner on January 31, 2007. At his May 15, 2007 deposition Harried revealed that he had informed Guy and Brock about his prior lawsuit with Attorney Pritchard. After some months of delay during which Illinois Central sought to discover documents referenced at the deposition, Illinois Central filed an opposed motion on October 29, 2007, seeking leave to join Guy and Brock as defendants in the Harried suit. That motion was granted on January 10, 2008, and on January 17, 2008, Illinois Central filed the amended complaint joining Guy and Brock to the suit. January 10, 2008, was also the day when Illinois Central deposed Turner in its suit against him. Turner's testimony also indicated that Guy and Brock knew of his involvement in Cosey. Illinois Central then sought leave to join Guy and Brock to Turner's case on January 31, 2008. The district court granted leave, and Illinois Central filed its amended pleading on February 4, 2008.

The actions were consolidated for trial on Illinois Central's claims for fraud and breach of the duty of good faith and fair dealing claims against all four defendants. Guy and Brock pleaded defenses of statute of limitations and waiver. Illinois Central sought to prove fraudulent concealment, alleging that Guy and Brock's representations and conduct during the Eakins litigation prevented discovery of their role in the omissions from Turner's interrogatory responses and Harried's pulmonary questionnaire. The jury found against Illinois Central on its claims against Turner and Harried, but it returned a general verdict awarding Illinois Central $210,000 in compensatory damages for

---

[5] Acuff, 950 So.2d at 955-56; McDaniel, 951 So.2d at 528-29.

its fraud and bad faith claims against Guy and Brock. After a second phase of deliberation, the jury awarded Illinois Central an additional $210,000 in punitive damages. Guy and Brock moved for judgment as a matter of law on various issues, including their statute-of-limitations and waiver defenses. Their post-trial motion also asserted that the district court lacked subject-matter jurisdiction under the Rooker-Feldman doctrine. The district court denied their motion and entered judgment reflecting the jury verdict. Guy and Brock timely appealed.

## II. Jurisdiction and Abstention

### A. Rooker-Feldman

We review challenges to the district court's jurisdiction de novo. SmallBizPros, Inc. v. MacDonald.[6] Guy and Brock contend that the Rooker-Feldman doctrine precludes jurisdiction. That doctrine bars lower federal courts from "exercising appellate jurisdiction over final state-court judgments." Lance v. Dennis.[7] It applies only in circumstances closely akin to those addressed in the Rooker and Feldman decisions,[8] in which a party suffered an adverse final judgment rendered by a state's court of last resort, and then initiated proceedings in a lower federal court seeking review and reversal of the state-court judgment. District of Columbia Court of Appeals v. Feldman[9]; Rooker v. Fidelity Trust Co.[10] Accordingly, the doctrine usually applies only when a

---

[6] 618 F.3d 458, 461 (5th Cir. 2010).

[7] 546 U.S. 459, 463, 126 S. Ct. 1198, 1201 (2006).

[8] Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284, 125 S. Ct. 1517, 1521 (2005).

[9] 460 U.S. 462, 466-68, 470-73, 103 S. Ct. 1303, 1306-10 (1983).

[10] 263 U.S. 413, 414-15, 44 S. Ct. 149, 149-50 (1923).

plaintiff explicitly attacks the validity of a state court's judgment, Weaver v. Texas Capital Bank N.A.,[11] though it can also apply if the plaintiff's federal claims are so inextricably intertwined with a state judgment that the federal court "is in essence being called upon to review the state court decision." Feldman.[12]

The Rooker-Feldman doctrine does not apply to this case because adjudicating Illinois Central's claims did not require the district court to review any final judgment rendered by a state court. Guy and Brock contend that litigating Illinois Central's fraudulent concealment theory amounted to review of the Mississippi Supreme Court's judgments in Acuff and McDaniel.[13] We disagree.

None of the parties to this case except for Illinois Central were parties to the Acuff and McDaniel appeals, and Illinois Central did not request or obtain any relief inconsistent with the judgments the Mississippi Supreme Court affirmed. We recognize that the Tyler omissions and the subsequent irregularities in Guy and Brock's efforts to reassure Illinois Central regarding their procedures for getting information from their clients were material to some of the legal issues Acuff and McDaniel addressed.[14] In particular, the Mississippi Supreme Court was called upon to decide whether the trial court should have given Illinois Central relief from its obligations to the remaining

---

[11] 660 F.3d 900, 904 (5th Cir. 2011).

[12] 460 U.S. at 483 n.16; 103 S. Ct. at 1316 n.16; Richard v. Hoechst Celanese Chem. Grp., Inc., 355 F.3d 345, 350-51 (5th Cir. 2003).

[13] Guy and Brock filed a motion that we take judicial notice of various papers filed in the Acuff and McDaniel appeals for purposes of deciding the jurisdictional issue. Nothing contained in those papers changes our analysis of Guy and Brock's Rooker-Feldman argument. The motion is DENIED as moot.

[14] Acuff, 950 So.2d at 955-56; McDaniel, 951 So.3d at 528-29.

13

unsettled Eakins and Allen plaintiffs under the settlement procedures agreements.[15]  But litigating Illinois Central's instant claims did not require revisiting that issue or changing the result that the Mississippi Supreme Court reached.   Illinois Central did not seek to rescind the settlement procedures agreement or recover money from the plaintiffs whose right to a settlement was at issue in Acuff and McDaniel.   The jury considered the Tyler omissions and what followed for their bearing on issues that were not litigated in Eakins or Allen: Guy and Brock's liability for fraud and bad faith in inducing Turner's and Harried's settlements, and Illinois Central's entitlement to relief from the statute of limitations on account of Guy and Brock's concealing their role in the fraud.  We also disagree with Guy and Brock's alternative contention that this case constitutes a collateral attack on the Eakins trial court's judgments dismissing Turner's and Harried's claims.  Illinois Central did not seek to revive those claims nor to obtain any other relief that would be inconsistent with the Mississippi court's dismissal of them.

B. Abstention

We review abstention decisions for abuse of discretion.   Stewart v. W. Heritage Ins. Co.[16] Burford abstention "is concerned with protecting complex state administrative processes from undue federal interference . . . ." New Orleans Pub. Serv., Inc. v. City Council of New Orleans.[17]  The Burford plaintiff brought a federal due process suit challenging a Texas Railroad Commission order granting a drilling permit.  The Supreme Court held that the federal district court should have abstained, noting that the state's regulatory scheme

---

[15] Acuff, 950 So.2d at 952-55; McDaniel, 951 So.2d at 525-29

[16] 438 F.3d 488, 491 (5th Cir. 2006).

[17] 491 U.S. 350, 361, 109 S. Ct. 2506, 2515 (1989).

was comprehensive, arose from the state's great interest in husbanding its mineral resources, and ensured a unified approach to permitting decisions by limiting judicial review to a single court.[18] The Supreme Court has subsequently held that the Burford doctrine does not require abstention whenever there exists a complex state administrative process, even if there is a potential for conflict with state regulatory law or policy.[19]

The Supreme Court has recognized other significant limits on Burford abstention. It is not appropriate when "timely and adequate state-court review" is not available,[20] and Burford does not allow district courts to dismiss or remand actions that seek damages alone. Quackenbush v. Allstate Ins. Co.[21] At most, Burford allows a damages action to be stayed.[22] Those limits bar abstention here. This is an action for damages. Were Illinois Central's fraud claims dismissed, Mississippi's applicable three-year statute of limitations would bar refiling them in state court.[23]

Even if those limits did not apply, Burford abstention would be inappropriate. We consider five factors when deciding whether Burford applies: "(1) whether the cause of action arises under federal or state law; (2) whether the case requires inquiry into unsettled issues of state law or into local facts; (3) the importance of the state interest involved; (4) the state's need for a coherent

---

[18] Burford, 319 U.S. at 318-20, 320 n.12, 324-27, 635 S. Ct. at 1099-1100, n.12, 1102-04.

[19] New Orleans Pub. Serv., 491 U.S. at 362, 109 S. Ct. at 2515 (citation and quotation marks omitted).

[20] Id. at 361, 109 S. Ct. at 2414.

[21] 517 U.S. 706, 731, 116 S. Ct. 1712, 1729 (1996).

[22] Id.

[23] 917 So.2d 783, 789 (Miss. 2005).

policy in that area; and (5) the presence of a special state forum for judicial review" Moore v. State Farm Fire & Cas. Co.[24] Only the first, and possibly the third factor favor abstention here. The relevant doctrines of Mississippi law are well settled. Mississippi undoubtably has an important interest in policing fraudulent conduct in litigation in its courts, but that interest is somewhat attenuated by the fact that the benefit obtained by fraud in this case did not take the form of a state-court judgment. A federal court's adjudicating Illinois Central's claims does nothing to impair the coherence of Mississippi's policy with respect to settlement fraud. Finally, Mississippi has arguably provided a "special forum" for actions seeking relief from a judgment obtained by fraud by requiring that such actions be brought in the court that rendered the judgment, but in this case Illinois Central did not seek relief from any judgment rendered by a Mississippi court.

### III. Fraudulent Concealment and Waiver

#### A. Standard of Review

We review the disposition of motions for judgment as a matter of law de novo, applying the same standard as the district court. Flowers v. S. Reg'l Physician Servs. Inc.[25] That standard requires the court to disregard all evidence favorable to the movant that the jury was not required to believe. E. Tex. Med. Ctr. Reg'l Healthcare Sys. v. Lexington Ins. Co.[26] The court must view the trial evidence in the light most favorable to the nonmovant, making all reasonable

---

[24] The applicable statute of limitations is the three-year period provided by § 15-1-49 of the Mississippi Code. Sanderson Farms Inc. v. Ballard, 556 F.3d 264, 272 (5th Cir. 2009) (internal citation omitted).

[25] 247 F.3d 229, 235 (5th Cir. 2001).

[26] 575 F.3d 520, 525 (5th Cir. 2009).

factual inferences and credibility assessments in the nonmovant's favor. Mullins v. TestAmerica, Inc.[27]

B. Fraudulent Concealment

Guy and Brock contend that Illinois Central presented insufficient evidence of fraudulent concealment to defeat their statute-of-limitations defense. The applicable statute of limitations is the three-year period provided by § 15-1-49 of the Mississippi Code. Sanderson Farms, Inc. v. Ballard.[28] The relevant part of § 15-1-49 provides that:

> (1) All actions for which no other period of limitation is prescribed shall be commenced within three (3) years next after the cause of such action accrued, and not after.
>
> (2) In actions for which no other period of limitation is prescribed and which involve latent injury or disease, the cause of action does not accrue until the plaintiff has discovered, or by reasonable diligence should have discovered, the injury.[29]

The statute of limitations normally runs from the time of the injury, not from its discovery. State Indus. Products Corp. v. Beta Technology, Inc.[30] But Mississippi Code § 15-1-49(2) provides a discovery rule that applies if a latent injury is present. See Archer v. Nissan Motor Acceptance Corp.[31] A latent injury is "one where the plaintiff will be precluded from discovering harm or injury because of the secretive or inherently undiscoverable nature of the wrongdoing

---

[27] 564 F.3d 386, 403 (5th Cir. 2009).

[28] 917 So.2d 783, 789 (Miss. 2005).

[29] Miss. Code Ann. § 15-1-49(1),(2) (Rev. 2003).

[30] 575 F.3d 450, 456 (5th Cir. 2009).

[31] 550 F.3d 506, 509 (5th Cir. 2008).

in question . . . ." PPG Architectural Finishes, Inc. v. Lowery.[32]  The "focus is on the time that the patient discovers, or should have discovered by the exercise of reasonable diligence, that he probably has an actionable injury."[33]  Section 15-1-49(2) delays accrual until a party discovers its injury, regardless of whether he has also discovered the cause.[34]

Illinois Central's claims thus accrued on February 13, 2004, the date when Peters and Garrett testified that they learned of Turner's and Harried's participation in Cosey.  At trial, Illinois Central sought to prove that the statute of limitations was tolled by Mississippi Code § 15–1–67, which provides tolling for fraudulent concealment:

> If a person liable to any personal action shall fraudulently conceal the cause of action from the knowledge of the person entitled thereto, the cause of action shall be deemed to have first accrued at, and not before, the time at which such fraud shall be or with reasonable diligence might have been, first known or discovered.[35]

Any party who asserts fraudulent concealment under § 15–1–67 must prove that: "(1) some affirmative act or conduct was done and prevented discovery of a claim, and (2) due diligence was performed on the party's part to discover [the claim]." Spann v. Diaz.[36]  The first element requires an affirmative action that is actually designed to prevent discovery of the claim.  Channel v. Loyacono.[37]  The second element requires proof that the plaintiff acted with due diligence in

---

[32] 909 So.2d 47, 50 (Miss. 2005) (internal quotation marks and citation omitted).

[33] Id. at 51 (quoting Wright v. Quesnel, 876 So.2d 362, 366 (Miss. 2004)).

[34] State Indus. Products Corp., 575 F.3d at 454.

[35] Miss. Code Ann. § 15–1–67 (Rev. 2003).

[36] 987 So.2d 443, 450 (Miss. 2008) (internal quotation marks, citation, and punctuation omitted).

[37] 954 So.2d 415, 423 (Miss. 2007).

18

attempting to discover the claim, and that the plaintiff was nevertheless unable to do so.  Robinson v. Cobb.[38]

Illinois Central joined Guy and Brock to the two actions making up the instant case on January 17, 2008, and February 4, 2008.  The dispositive question is thus whether the evidence at trial was sufficient for a reasonable jury to conclude (1) that Guy and Brock committed affirmative acts that prevented discovery of their responsibility for the Turner and Harried omissions until February 4, 2005, and (2) that from February 13, 2004, until February 4, 2005, Illinois Central exercised due diligence to discover who was responsible for the Harried and Turner omissions.[39]

---

[38] 763 So.2d 883, 887 (Miss. 2000).

[39] The district court's instructions regarding the statute-of-limitations fraudulent-concealment issues read as follows:

Jury Instruction No. 5

The law requires that a party seeking to recover damages must file its lawsuit within a certain period of time.  This period of time is known as the statute of limitations.  A statute of limitations is a law that bars a suit from being filed if a plaintiff does not bring it within a prescribed period of time.  The time period within which the suit must be brought begins when the plaintiff first knew, or by the exercise of reasonable diligence should have discovered the injury.  The Court instructs you that the statute of limitations applicable to the plaintiff's claims in this case is three (3) years.

(. . . .)

Jury Instruction No. 6

In regard to the statue of limitations, the Court instructs you that the plaintiff has asserted that the defendants fraudulently concealed the alleged fraud against the plaintiff and that this fraudulent concealment tolled the three (3) year statute of limitations as to the plaintiff's claims.  In order to prove fraudulent concealment of the claims to toll the statute of limitations, the plaintiff must prove by a preponderance of the evidence that the defendants committed an affirmative act to conceal the underlying tortious conduct, and that the plaintiffs failed to discover the factual basis for the claims despite the exercise of due diligence.

If you find that the plaintiff has proven by a preponderance of the evidence that the defendants fraudulently concealed the alleged claims, the cause of action shall be deemed to have first accrued at, and not before, the time at which such fraud was, or with reasonable diligence might have been, first known or discovered

We find that there was sufficient evidence of affirmative acts of concealment. In the April 22, 2004 letter to Peters, Guy and Brock assured Illinois Central that they had been thorough and accurate in collecting information from the Eakins plaintiffs. Guy and Brock made similar assurances in the hearings in June and August, 2004, and at Tyler's truncated deposition in August 2004. Guy and Brock also promised, in the March 29, 2004 handwritten agreement, that they would send Illinois Central a letter explaining their procedures for collecting the information. And on April 28, 2004, Guy and Brock sent Illinois Central a letter falsely purporting to be from Fred Tyler and stating that the omissions from Tyler's interrogatory responses were simply a mistake on Tyler's part. Finally, Guy and Brock terminated Tyler's August 2004 deposition shortly after it began. From these acts, the jury could have reasonably inferred a design on Guy and Brock's part to conceal their disregard for the truth with respect to materials they prepared on behalf of Tyler and other Eakins plaintiffs, including Turner and Harried.

It was not unreasonable for the jury to conclude that Illinois Central exercised due diligence. Peters and Garrett testified that they believed Guy and Brock's assurances, and Peters's comments at the June 2004 hearing can be understood as expressing concern that many Eakins plaintiffs had given Guy and Brock inaccurate information, rather than as suspicion of Guy and Brock's having committed fraud. Arguably, Guy and Brock's failure to supply the promised letter describing their procedures and their refusal to allow Illinois Central's attorneys to complete Tyler's deposition should have raised suspicion that Guy and Brock were concealing wrongdoing. But Illinois Central's counsel could have reasonably attributed their conduct to defensiveness of their

by the plaintiff.

professionalism in collecting information from their clients and frustration with the course the litigation had taken since the revelation of the Tyler omissions. Dilatory and defensive conduct is not unusual in litigation, particularly when an agreement settling a large case has broken down. Such conduct rightly provokes suspicion that opposing counsel is hiding something. But a reasonable litigant would not typically assume that what is being hidden is opposing counsel's own fraud. Even when a litigant has reason to suspect there has been some kind of malfeasance in the conduct of the litigation, he should be permitted to give opposing counsel the benefit of the doubt in the face of repeated assurances of opposing counsel's good faith and best efforts.

Guy and Brock point out that even if Illinois Central should not have suspected them of fraud, it certainly had reason to suspect Harried and Turner. We note that Illinois Central need not demonstrate due diligence with respect to its claims against Turner and Harried; its suits against them were timely. And for the reasons already stated we do not fault Illinois Central for assuming that it was Turner and Harried, rather than Guy and Brock, whom Illinois Central should sue for the settlement fraud. Guy and Brock make much of the fact that Illinois Central never called the Turner and Harried omissions to Guy and Brock's attention during the Eakins litigation. But in trying to get to the bottom of the Tyler omissions, Illinois Central pursued much the same inquiry it would have made had it raised the Turner and Harried omissions. Illinois Central tried to find out how Guy and Brock collected information from their clients in order to determine whether the Tyler omission was an isolated incident or symptomatic of some systematic problem. When Illinois Central tried to find those things out, Guy and Brock responded with assurances that they had been honest and thorough in gathering information from their clients. Illinois Central sought to verify those assurances. Its attorneys tried to depose

Tyler and they demanded that Guy and Brock supply the description of their procedures that was promised in the March 2004 handwritten agreement. It is very likely that those measures would have ultimately revealed Guy and Brock's role in the Turner and Harried omissions. But Guy and Brock prevented that by terminating Tyler's 2004 deposition and failing to provide the description. The jury could reasonably have concluded that Guy and Brock would not have been more cooperative in response to inquiries about the Turner and Harried omissions.

As it happened, the Eakins trial court refused to force Guy and Brock to provide the description of their procedures or provide any further relief on the basis of the Tyler omission, and Illinois Central calculated that it could best pursue the Turner and Harried omissions in a different forum. Guy and Brock contend that countenancing Illinois Central's forum shopping would offend principles of comity because Mississippi law obliges a party seeking relief from a judgment to proceed in the court that rendered it. But that argument assumes that in bringing this action Illinois Central sought relief from a judgment rendered in the Eakins litigation, which it did not. None of the authorities Guy and Brock cite indicate that the beneficiary of a judgment of dismissal who was defrauded into paying too much for the plaintiff's agreeing to the judgment must sue in the same court that rendered it. Such a rule would be anomalous, given that the suit does not seek to reopen the dismissed case or question the validity of the court's judgment. Cf. Kokkonen v. Guardian Life Ins. Co. of America.[40]

We conclude that the trial evidence sufficed for a reasonable jury to find that Guy and Brock's representations during the Eakins litigation prevented discovery of their responsibility for the Turner and Harried omissions until after

---

[40] 511 U.S. 375, 380-81, 114 S. Ct. 1673 1676-77 (1994).

February 4, 2005, and that due diligence did not require Illinois Central to investigate the Harried and Turner omissions any more aggressively than they did.

C. Waiver.

Guy and Brock contend that Illinois Central's conduct in the Eakins litigation after discovering the Turner and Harried omissions constituted a waiver of its claims. They rely on Turner v. Wakefield[41] and Bogy v. Ford Motor Company.[42] In Turner, the Mississippi Supreme Court restated Mississippi's general rule that a party who discovers it has been fraudulently induced to enter into a contract "has an election to either rescind, in which event he must tender back that which he has received, or he may affirm the agreement, and maintain his action in damages for deceit."[43] In Bogy, the Fifth Circuit made an Erie guess that the Mississippi Supreme Court would extend this rule to settlement agreements.[44]

The Turner court also explained that a party that has discovered it was induced into an agreement by fraud waives the right to rescind or sue for damages if the party continues to ratify the contract by carrying out its obligations or accepting the contract's benefits.[45] The Turner court adopted this rule from a Colorado Supreme Court case, Stoner v. Marshall.[46] In both Turner

___

[41] 481 So.2d 846 (Miss. 1985).

[42] 538 F.3d 352 (5th Cir. 2008).

[43] Turner, 481 So.2d at 848 (internal citation omitted).

[44] Bogy, 538 F.3d at 355 (holding that plaintiff could affirm the agreement and sue for fraud rather than rescind and return settlement payments).

[45] Turner, 481 So.2d at 848

[46] 358 P.2d 1021 (Colo. 1961).

and Stoner, the plaintiff had purchased a business and, as payment, agreed to make installment payments over a number of months or years.[47] The plaintiff was disappointed in the business, feeling it was less profitable than was promised, but the plaintiff nevertheless continued operating the business and paying installments for some time.[48] The plaintiff eventually defaulted, and when the plaintiff was sued on the debt the plaintiff asserted that the purchase of the business was fraudulently induced by misrepresentations of its profitability.[49] Both courts held that the plaintiff waived the right to rescind or sue for damages by continuing to make payments and operate the business. [50] Otherwise, a party who discovers he was fraudulently induced to make an agreement could speculate on the value of the contract by continuing to perform and receive its benefits. If the contract turns out well for him, he can ratify; if it does not, he can either rescind or affirm and sue for damages.[51] Thus, "Upon discovery [of the fraud], the one defrauded must act promptly and finally to repudiate the agreement; however, a continuance to ratify the contract terms constitutes a waiver."[52]

Before the district court, Guy and Brock argued that under Bogy and Turner Illinois Central waived its fraud claims by failing to rescind Harried's and Turner's settlement agreements. Rejecting this argument, the district court correctly observed that Illinois Central also had the option of affirming the

---

[47] Turner, 481 So.2d at 847; Stoner, 358 P.2d at 1021-22.

[48] Turner, 481 So.2d at 847-48; Stoner, 358 P.2d at 1022.

[49] Turner, 481 So.2d at 848; Stoner, 358 P.2d at 1022

[50] Turner, 481 So.2d at 849-50; Stoner, 358 P.2d at 1022-23.

[51] Turner, 481 So.2d at 849-50; Stoner, 358 P.2d at 1023.

[52] Turner, 481 So.2d at 849 (citing Stoner, 358 P.2d at 1022-23).

settlements and suing for damages. On appeal, Guy and Brock invoke Turner's requirement that after a party discovers it was fraudulently induced to make an agreement, the party waives its claim if it continues to perform obligations or accept benefits under the contract. Guy and Brock argue that by failing to raise the Turner and Harried omissions with the Eakins trial court, Illinois Central failed to "promptly" choose between rescinding the settlement agreements or affirming them and then suing for damages.[53]

Turner and the other Mississippi cases Guy and Brock cite on this point stand for the proposition that after learning of fraudulent inducement, a party may not carry on performing or benefitting from a contract without waiving its right to rescind or bring a claim. In each case, the fraud plaintiff ratified the contract by performing an obligation or accepting a benefit after the plaintiff knew or should have known of fraudulent inducement.[54] Although Illinois Central did not repudiate the settlement agreements with Turner and Harried, there is no evidence it did anything to ratify them after February 13, 2004. Illinois Central acted strategically by seeking relief in separate action rather than calling the Eakins trial court's attention to the fraud, but that does not show that Illinois Central was somehow able to speculate on the value of the releases of Turner's and Harried's claims.[55]

---

[53] If we found merit in this argument, we would be required to consider whether it must be considered waived because of its differences from the decision below. See Celanese Corp. v. Martin K. Eby Const. Co., Inc., 620 F.3d 529, 531 (5th Cir. 2010). Because we find that Guy and Brock's argument based on Turner lacks merit, we express no opinion as to whether it was waived.

[54] Holland v. Peoples Bank & Trust, Co., 3 So.3d 94, 103 (Miss. 2008); Edwards v. Wurster Oil Co., Inc., 688 So.2d 772, 777 (Miss. 1997); Allen v. Mac Tools., Inc., 671 So.2d 636, 640-42 (Miss. 1990); Austin Dev. Co., Inc. v. Bank of Meridian, 569 So.2d 1209, 1212 (Miss. 1990); Turner, 481 So.2d at 848; Citizens Nat'l Bank v. Waltman, 344 So.2d 725, 727-28 (Miss. 1977).

[55] 671 So.2d at 640-42.

IV. Conclusion

The district court's judgment is AFFIRMED. The motion carried with case is DENIED as moot.

JENNIFER WALKER ELROD, Circuit Judge, dissenting:

I would reverse because doing nothing is not due diligence. The record reflects that, despite obtaining evidence of Guy's and Brock's potentially fraudulent conduct, Illinois Central took no action to investigate or pursue its potential claims after August 27, 2004, the date of the Fred Tyler deposition. Illinois Central conceded this point at oral argument, acknowledging that it could not point to "specific actions after August" to demonstrate its due diligence. Pursuant to the Mississippi Code's three year statute of limitations, Illinois Central was therefore required to sue Guy and Brock no later than August 27, 2007. Illinois Central did not join Guy and Brock in the actions against Willie Harried and Warren Turner until January 17, 2008 and February 4, 2008, respectively. That was too late. The claims against Guy and Brock are time barred.

The majority opinion applies the fraudulent concealment statute to excuse the tardiness of the claims but, in doing so, gives short shrift to Mississippi's due diligence requirement:

> If a person liable to any personal action shall fraudulently conceal the cause of action from the knowledge of the person entitled thereto, the cause of action shall be deemed to have first accrued at, and not before, the time at which such fraud shall be, or with reasonable diligence might have been, first known or discovered.

Miss. Code § 15-1-67 (emphasis added). The Supreme Court of Mississippi has repeatedly held that "[a]ny party who asserts a claim of fraudulent concealment must prove that (1) some affirmative act or conduct was done and prevented discovery of a claim, and (2) due diligence was performed on the party's part to

27

discover it."[1] Spann v. Diaz, 987 So.2d 443, 449 (Miss. 2008) (citations, internal quotation marks, and alterations omitted). With regard to the second prong, the movant must demonstrate that "he acted with due diligence in attempting to discover the factual basis for his claims and was unable to do so." Bullard v. Guardian Life Ins. Co. of America, 941 So.2d 812, 819 (Miss. 2006). Thus, "a plaintiff cannot satisfy the due diligence requirement if he had information regarding the claim and failed to take action before the statute of limitations expired." Trustmark Nat'l Bank v. Meador, 81 So.3d 1112, 1120 (Miss. 2012).

Illinois Central was required to act with due diligence through February 4, 2005 in order for its claims to survive the statute of limitations. The record demonstrates, however, that from August 28, 2004 through February 4, 2005 Illinois Central failed to investigate or take any action whatsoever upon the information in its possession that inculpated Guy and Brock.[2] Such inaction

---

[1]  "To determine Mississippi law, we look to the final decisions of Mississippi's highest court." Estate of Bradley ex. rel. Sample v. Royal Surplus Lines Ins. Co., 647 F.3d 524, 528–29 (5th Cir. 2011).

[2]  The record reflects that Illinois Central possessed information in 2004 that seriously inculpated either Guy's and Brock's clients or Guy and Brock themselves in fraudulent conduct directed towards Illinois Central. First, Illinois Central learned in early 2004 that Turner, Harried, and another Eakins plaintiff, Fred Tyler, had all failed to disclose their prior participation in the Cosey litigation. Second, in June 2004, Illinois Central informed the Mississippi court that it had concerns about "systemic problems" regarding disclosures (or lack thereof) made by the Eakins plaintiffs. Third, despite Guy's and Brock's March 29, 2004 agreement to provide Illinois Central with their procedures for ensuring that their clients reported accurate information, Guy and Brock never delivered said procedures. Fourth, Guy and Brock prematurely terminated Illinois Central's August 27, 2004 deposition of Tyler before Illinois Central could inquire about Tyler's non-disclosure of his connection to Cosey. The foregoing facts, taken collectively, demonstrate that Illinois Central was on notice in 2004 that a cause of action potentially existed against Guy and Brock. See also Spann, 987 So.2d at 450 ("The would-be plaintiff need not have become absolutely certain that he had a cause of action; he need merely be on notice—or should be—that he should carefully investigate the materials that suggest that a cause of action probably or potentially exists." (quoting First Trust Nat'l Ass'n v. First Nat'l Bank of Commerce, 220 F.3d 331, 336–37 (5th Cir. 2000))). Even the majority opinion observes: "[a]rguably, Guy and Brock's failure to supply the promised letter describing their procedures and their refusal to allow Illinois Central's attorneys to complete

precludes tolling under the Mississippi Supreme Court's interpretation of § 15-1-67.[3]   See Meador, 81 So.2d at 1120; Spann, 987 So.2d at 450; Bullard v. Guardian Life Ins. Co. of America, 941 So.2d 812, 819 (Miss. 2006); Sanderson Farms Inc. v. Ballard, 917 So.2d 783, 790 (Miss. 2005); see also Boone v. Citigroup, Inc., 416 F.3d 382, 390 n.11 (5th Cir. 2005); cf. First Trust Nat'l, 220 F.3d at 337–38 ("While fiduciary relationships do often obscure misfeasance on the fiduciary's part . . . the principal of a fiduciary is not thereby permitted permanently and willfully to ignore patent evidence of the fiduciary's breach so as to delay indefinitely the accrual  of an action against the fiduciary.  Statutes of limitations exist to protect the courts from indolent claimants as well as defendants from stale claims.") (emphasis added) (footnote omitted).

The majority opinion glosses over the critical temporal gap between August 28, 2004 and February 4, 2005 by stating that "[e]ven when a litigant has reason to suspect there has been some kind of malfeasance in the conduct of the litigation, he should be permitted to give opposing counsel the benefit of the doubt in the face of repeated assurances of opposing counsel's good faith and best efforts."  This statement, which is unsupported by any authority, improperly conflates the two prongs of the tolling inquiry under § 15-1-67, thereby creating an unprecedented exception to the Mississippi Supreme Court's interpretation of the statute.  Guy's and Brock's assurances of good faith and best efforts, which

Tyler's deposition should have raised suspicion that Guy and Brock were concealing wrongdoing."

[3] Assuming Illinois Central truly did not suspect Guy and Brock of wrongdoing until it deposed Harried on May 15, 2007, as it alleges, Illinois Central's subjective viewpoint is irrelevant for the purposes of our tolling inquiry.  "The proper test is whether a reasonable person similarly situated would have discovered potential claims."  Whitaker v. Limeco Corp., 32 So.3d 429, 436 (Miss. 2010) (citation and internal quotation marks omitted).  Given the facts discussed in footnote 2, supra, Illinois Central's failure to suspect Guy and Brock of wrongdoing in 2004 was objectively unreasonable.

relate to the first prong's affirmative act of concealment requirement, do not offset or lessen Illinois Central's burden to satisfy the due diligence prong.

I respectfully dissent.